The defendant challenges the lawfulness of a search of the backyard of his house, where a police officer discovered a loaded firearm. At the suppression hearing, four police officers and two detectives testified concerning their respective actions at the defendant’s house on July 11, 2009. The four officers responded at different times between 5:00 a.m. and 5:10 a.m., all within minutes of a 911 emergency telephone call concerning a male who had been shot at that location.
The first officer to arrive, Police Officer Robert Allen, spoke with the defendant’s wife, who was still on the phone with the 911 operator in front of the house. She stated that her husband had shot himself in the hand and was inside the house; she did *948 not know where the gun was. Officer Allen further testified that he “understood” there were children in the house, but he did not indicate the source of that understanding. Officer Allen immediately went inside and found the defendant at the end of a hallway in a bedroom doorway. The defendant was bleeding profusely from a serious hand wound and was not entirely coherent.
Police Officer Ralph Swanson arrived in a separate vehicle immediately after Officer Allen and saw him running into the house. Officer Swanson ran inside, not stopping to speak with the defendant’s wife. Officers Allen and Swanson, with their guns drawn, ordered the defendant to come toward them down the hallway into the living room, which was by the front door; the defendant complied. On the floor of the living room, Officer Swanson bolstered his weapon and frisked the defendant, but did not find the gun. The officers asked what had happened, and the defendant said he had been on the couch when he accidentally shot himself. The two officers repeatedly asked where the gun was; the defendant stated he did not know and that he usually kept it in a drawer in his bedroom or a safe in the basement. The questioning continued as emergency medical technicians (hereinafter EMT) arrived and ministered to the defendant’s injury. Officer Swanson testified that, at this point, he did not know if anyone was outside with the defendant’s wife.
Police Officer Raymond Buttacavoli arrived when the defendant was being treated by the EMT; Officer Swanson was also with the defendant, but then walked away. Officer Buttacavoli questioned the defendant further and discovered a holster for a gun protruding from between two pillows of the couch. As he was questioning the defendant, Officer Buttacavoli was not sure where Officers Allen and Swanson had gone; there “were people scattered” through the house and he was aware that Officers Allen and Swanson were “checking the rest of the house.”
At the time when Officer Buttacavoli was with the defendant and Officers Allen and Swanson were checking the house, Police Officer Nicholas Alvarado arrived and learned from Officer Buttacavoli that the weapon was still missing and there were three children in the house. Officer Alvarado testified that, since other officers were already checking the house, he went into the backyard, searched it, and found a black plastic bag containing a handgun on the ground beside a shed; he then secured the area.
While Officer Alvarado was in the backyard, three children were removed from the house. Officer Swanson testified that, after he determined that the defendant had no weapon, he left *949 the defendant with the EMT and removed everyone from the house. Three children were in bedrooms down the same hallway where the defendant had initially been found. The defendant’s daughter, who was about 10 years old, was in her parents’ bedroom, and the defendant’s son and his friend, both of whom were about 15 or 16 years old, were in another bedroom. Officer Alvarado testified that he was “not sure exactly the time that [the children] were removed from the house,” but he saw them sitting in a vehicle parked in the driveway when he “exited the backyard” after finding the handgun.
Detective Thomas Pollock testified that he arrived at the scene about two hours later, at approximately 7:15 a.m. Officer Swanson told him that the defendant had been transported to the hospital and that a gun was behind the shed in the backyard. Detective Pollack obtained a written consent from the defendant’s wife to search the premises. Detective Lee Krill testified that he arrived at about 9:40 a.m., and he retrieved the gun from the backyard and other evidence from inside the premises.
Based on this record, we determine that the Supreme Court properly denied suppression of the handgun seized from the backyard. While the consent of the defendant’s wife did not render the handgun admissible (see People v May, 52 AD3d 147, 152 [2008]; cf. Matter of Leroy M., 16 NY3d 243, 246-247 [2011], cert denied 565 US —, 132 S Ct 155 [2011]), the People met their burden of demonstrating the legality of the police conduct (see People v Berrios, 28 NY2d 361, 367 [1971]; People v Cole, 85 AD3d 1198 [2011]), pursuant to the emergency exception to the warrant requirement. “[Al]though warrantless entries into a home are ‘presumptively unreasonable’ ” (People v Molnar, 98 NY2d 328, 331 [2002], quoting Payton v New York, 445 US 573, 586 [1980]), a warrantless search and seizure in a protected area may be lawful under some circumstances, pursuant to the emergency doctrine (see People v Mitchell, 39 NY2d 173, 177-178 [1976], cert denied 426 US 953 [1976]). The exception applies where the police (1) have “reasonable grounds to believe there is an emergency at hand and an immediate need for their assistance for the protection of life or property,” (2) are “not . . . primarily motivated by intent to arrest and seize evidence,” and (3) have a “reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched” (People v Mitchell, 39 NY2d at 177-178; see People v Stanislaus-Blache, 93 AD3d 740, 741-742 [2012]; People v Rodriguez, 77 AD3d 280, 283 [2010]).
The United States Supreme Court has held that the subjective intent of the police is not relevant to determining the *950 reasonableness of police conduct under the Fourth Amendment to the United States Constitution (see Brigham City v Stuart, 547 US 398, 403 [2006]). Consequently, the second prong of Mitchell is now relevant, if at all, only to claims raised under the New York State Constitution (see NY Const, art I, § 12). We need not determine in this case whether the second prong of Mitchell is still viable under the New York State Constitution (see People v Stanislaus-Blache, 93 AD3d at 742; cf. People v Robinson, 97 NY2d 341, 350 [2001]), because we conclude that the actions of the police officers were permissible under both Brigham City and Mitchell (see People v Stanislaus-Blache, 93 AD3d at 742).
Here, the police initially entered the house after they received a 911 call regarding a shooting and had confirmed that information with a person who was outside the house. Under these circumstances, the initial entry into the house was lawful (see People v Stanislaus-Blache, 93 AD3d at 741-742; People v Rodriguez, 77 AD3d at 288-289; People v Desmarat, 38 AD3d 913, 914-915 [2007]). Moreover, the additional information available to the officers who initially responded, including the defendant’s incoherence and evasive answers about the location of the gun and the presence of children on the premises, established an ongoing emergency and danger to life, justifying the search for and seizure of the gun (see People v Stanislaus-Blache, 93 AD3d at 741-742; People v Bower, 27 AD3d 1122, 1124 [2006]; People v Smith, 302 AD2d 410 [2003]; People v Parker, 299 AD2d 859, 860 [2002]; People v Adams, 236 AD2d 293 [1997]). Further the officers’ testimony established that the search was not primarily motivated by the intent to make an arrest or seize evidence, and that there was a reasonable basis, approximating probable cause, to associate the area searched with the emergency (see People v Stanislaus-Blache, 93 AD3d at 742; People v Desmarat, 38 AD3d at 915).
We do not agree with our dissenting colleagues that the emergency abated once the police frisked the defendant and knew that the children did not have the gun. The testimony established that, at the time Officer Alvarado decided to search the backyard, he was aware that other officers were searching the house, but he was not aware that the children were secure and out of danger. He testified that he was only inside the house “shortly” before he went outside, the children were removed from the house “shortly after,” but he was not sure exactly of the time that they were removed, and he did not observe the manner in which the other officers “secured” the children. In context, therefore, his testimony that he perceived the children *951 to be in nightwear and that they did not have a gun related to his observation of them after he left the backyard. The lack of evidence pinpointing the exact moment the children were being removed relative to Officer Alvarado’s search for the gun was not attributable to the People’s failure to meet their burden, but rather, was explained by the fact that different officers were searching different parts of the premises simultaneously due to the emergency and, therefore, no one officer was in possession of all the facts. Under all the circumstances, we deem the officers’ actions to have been “ ‘strictly circumscribed by the exigencies’ ” (Mincey v Arizona, 437 US 385, 393 [1978], quoting Terry v Ohio, 392 US 1, 26 [1968]), which included the defendant’s evasive answers about the possible location of the gun, the rapidly unfolding events within a matter of a few minutes, the manifest objective of the officers to safeguard the residents, and the simultaneous search of different parts of the premises by different officers. Accordingly, the Supreme Court properly denied suppression of the handgun.
The defendant failed to preserve for appellate review his challenge to the legal sufficiency of the evidence (see CPL 470.05 [2]; People v Goddard, 72 AD3d 839, 839-840 [2010]). In any event, contrary to the defendant’s contention, the People adduced evidence disproving, beyond a reasonable doubt, the defense of temporary lawful possession of a weapon (see People v Sooknanan, 92 AD3d 810 [2012]; People v Sheehan, 41 AD3d 335 [2007]; see also People v Banks, 76 NY2d 799 [1990]; People v Hughes, 289 AD2d 186 [2001]). Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15 [5]; People v Danielson, 9 NY3d 342 [2007]), we nevertheless accord great deference to the jury’s opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Mateo, 2 NY3d 383, 410 [2004], cert denied 542 US 946 [2004]; People v Bleakley, 69 NY2d 490, 495 [1987]). Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence (see People v Romero, 7 NY3d 633 [2006]).
The defendant failed to preserve for appellate review his contention that the prosecutor committed misconduct in connection with certain opening remarks and certain direct examination questions (see CPL 470.05 [2]; People v Paul, 82 AD3d 1267 [2011]; People v Salnave, 41 AD3d 872, 874 [2007]). In any event, the isolated remarks and questions by the prosecutor were not so pervasive or flagrant as to deny the defendant a fair trial under the circumstances of this case (see People v Almonte, 23 AD3d 392, 394 [2005]; People v Svanberg, 293 AD2d 555 [2002]).
*952 The record shows that defense counsel provided meaningful representation to the defendant, and, thus, he was not deprived of the effective assistance of counsel (see People v Benevento, 91 NY2d 708 [1998]; People v Baldi, 54 NY2d 137 [1981]). Skelos, J.P., Angiolillo and Belen, JJ., concur.